WESTERN MASSACHUSETTS ELECTRIC COMPANY *vs.*
DEPARTMENT OF PUBLIC UTILITIES
(and a companion case[1]).

Suffolk.    March 10, 1977. — August 25, 1977.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Public Utilities.    Electric Company.    Practice, Civil,* Review of order
of department of public utilities.

An electric company was prohibited by G. L. c. 164, § 94G, from using
a fuel charge to recover costs which were not related in any way to
the cost of fuel. [232]
The Department of Public Utilities was not precluded from prohibiting
an electric company from recovering costs according to a long-
standing exclusion in a fuel expense adjustment clause where the
exclusionary language of the clause had previously had no practical
significance and where, from the first occasion when it became sig-
nificant, the department expressed uncertainty about the propriety
of the company's fuel expense adjustment factor and granted only
tentative approval of the fuel factors. [234-235]
It was within the discretion of the Department of Public Utilities not
to compel a retroactive adjustment in an electric company's fuel
charges which were found to be in violation of G. L. c. 164, § 94G.
[236]

Two CIVIL ACTIONS commenced in the Supreme Judicial
Court for the county of Suffolk on May 24, 1976, and July
15, 1976, respectively.

The cases were reserved and reported by *Kaplan,* J.

*Robert S. Cummings (Maurice L. Zilber* with him) for
Western Massachusetts Electric Company.

*Charles P. Gamer,* Assistant Attorney General *(David
M. Siegel,* Assistant Attorney General, with him) for the
Attorney General.

*Michael Eby,* Special Assistant Attorney General, for
the Department of Public Utilities.

---

[1] The companion case is an appeal by the Attorney General from
orders of the Department of Public Utilities.

WILKINS, J.   These appeals concern orders and decisions of the Department of Public Utilities (department) which dealt with charges made by Western Massachusetts Electric Company (company) for fuel costs. The company appeals from a decision, and accompanying orders, which disapproved its fuel charge to be effective during July, 1976. The department concluded, we think correctly, that the company's proposed fuel charge failed to conform to the requirements of G. L. c. 164, § 94G, inserted by St. 1974, c. 625, § 1. The Attorney General, acting through his consumer protection division, has appealed from two decisions, and accompanying orders, which approved the company's fuel charges to be made during March and April, 1976. These two earlier filings of fuel charges were based on the same procedure which the department later concluded was not in conformity with G. L. c. 164, § 94G. However, the department did not order any adjustment of the earlier fuel charges, and we conclude that, in the absence of any showing of substantial prejudice to the company's customers, the department acted properly within its discretion in declining to apply its ruling concerning the unlawfulness of the company's fuel charges to periods prior to July 1, 1976.

On August 26, 1974, in response to the requirements of St. 1974, c. 625, § 4,[2] the company filed an application with the department for approval of a fuel expense adjustment clause to be effective on September 16, 1974.[3] Put in general terms, the proposed fuel clause provided that the company's fuel charge would be determined by dividing the company's fuel expense in a given month by the net kilo-

---

[2] Statute 1974, c. 625, § 4, reads as follows: "Notwithstanding the provisions of section one of this act, any fuel charge in effect on the effective date of this act shall remain in effect for sixty days thereafter or until such time as a fuel charge is approved by the department of public utilities pursuant to the provisions of section ninety-four G of chapter one hundred and sixty-four, inserted by section one of this act, whichever shall first occur."

[3] All filings of fuel clauses referred to in this opinion had effective dates which were applicable "as to consumption of electricity by the Company's customers as shown by meter readings on and after" the effective date.

Western Massachusetts Electric Co. *v.* Department of Public Utilities.

watt hours (KWH) supplied by the company during that month, with one exception which lies at the heart of the principal dispute in these appeals. The company proposed to exclude from the calculation of its fuel charge (a) those fuel costs which were attributable to any new nuclear unit which was not reflected in the rate base used in determining its rates currently in effect, and (b) the energy supplied by any such new nuclear unit during the appropriate month. The resulting "Current Period Cost per [KWH]" was to be charged uniformly to customers during the second successive month.[4]

In 1974 and 1975, the provision concerning new nuclear units was of no consequence in the determination of the company's fuel charges because the company had no nuclear unit in commercial operation whose existence was not reflected in its rates. In January, 1976, however, a nuclear plant, known as Millstone Unit No. 2 (Millstone #2), in which the company had a 19% share, became operational commercially. When the fuel charge for March, 1976, came to be calculated (based on the January, 1976, experience), the exclusionary language of the company's fuel expense adjustment clause became significant in a practical sense for the first time.[5]

It is clear beyond question that the cost of nuclear fuel per KWH was substantially less than the company's cost of fuel per KWH from other fuel sources.[6] Therefore, if the exclusionary language of the company's fuel adjustment expense clause were disregarded, the March, 1976,

___

[4] The fuel charge was to be adjusted for the company's delivery efficiency, the ratio of (1) KWH sales and use during 1973 to (2) the net KWH supplied from all sources of energy in 1973.

[5] Power had been furnished to company customers during January, 1976, from Millstone #2, and fuel expenses for Millstone #2 had been incurred. The company's investment in Millstone #2 had not been included in its rate base, and the company had not undertaken to file rates which would reflect its share of Millstone #2.

[6] Part of the company's power was obtained from Millstone Unit #1, a nuclear unit, but because the company's investment in Millstone Unit #1 was reflected in its rates, the fuel expense of Millstone Unit #1 and its KWH generation was included in the calculation of the company's fuel charge to be effective during March, 1976.

fuel charge per KWH made uniformly to all customers of the company would have been lower.

As required by G. L. c. 164, § 94G, the department held a public hearing on the company's filing of its proposed fuel charge to be effective during March, 1976. The Attorney General intervened and challenged the company's fuel expense adjustment clause as unauthorized by G. L. c. 164, § 94G. The department concluded that the subject required further investigation, and on March 1, 1976, it approved the company's proposed fuel factor "reserving the right to make a subsequent determination in this matter." The department called for a further hearing and indicated that the March fuel factor would "be subject to further adjustment in our decision regarding the April fuel factor." We think it clear that the department authorized the company's March, 1976, fuel charge on a tentative basis and that the department did not make a final decision concerning the company's March, 1976, fuel charge until a later date.[7]

The department continued in a state of uncertainty concerning the question whether the company's fuel expense adjustment clause met the requirements of G. L. c. 164, § 94G. On March 31, 1976, after two further public hearings, the department issued its decision and orders relating to the company's April, 1976, fuel charge. The department authorized the company to impose fuel charges in April calculated as previously, ordered a further hearing on the lawfulness of the procedures followed by the company, and reserved the right to modify the fuel charge of any subsequent period to adjust for whatever conclusions it might reach on further consideration. The Attorney General has appealed from this decision and its associated orders.[8]

---

[7] This circumstance is of significance in passing on the company's claim, which we discuss later, that the Attorney General's appeal of the department's decision on the company's March, 1976, fuel charge was not seasonable.

[8] This decision of March 31, 1976, contains a lack of finality not unlike that apparent in the decision of March 1, 1976, from which the Attorney General has also appealed.

The next step in this administrative process, as far as the record discloses, led to the decision and orders of the department from which the company appeals. On July 13, 1976, the department filed a decision and entered orders concerning the company's application for approval of a fuel charge to be effective during July, 1976. The department also treated its action as supplemental to its decision of March 31, 1976, relating to the company's April, 1976, fuel charge.[9] The department concluded that the exclusion of the fuel costs of, and energy supplied by, Millstone #2 produced a fuel charge which did not conform to G. L. c. 164, § 94G. The department ordered that the company calculate its July, 1976, fuel factor by including the effect of the operation of Millstone #2.[10]

The company appealed seasonably from the department's decision of July 13, 1976, and the Attorney General was permitted to intervene in the company's appeal. A single justice of this court permitted the company to collect fuel charges under bond pending the appeal in accordance with the terms of its original fuel expense adjustment clause. In May, 1976, the Attorney General had appealed the department's decisions of March 1 and March 31, 1976, concerning the fuel factors to be collected during the months of March and April, 1976, respectively. The company was permitted to intervene in that appeal. The two appeals were consolidated, and the consolidated cases were reserved and reported to the full bench by a single justice of this court.

---

[9] The department noted that it had authorized the company to continue the application of its fuel expense adjustment clause for the months of May and June, 1976. For reasons not apparent on the record, the department's determinations concerning May and June, 1976, have not been challenged on appeal.

[10] In May, 1976, the company filed a new general rate revision whose primary purpose was to permit recovery of the carrying charges of Millstone #2 and to permit a return on its investment in that plant. Presumably that rate proceeding is now concluded and perhaps the basic issue involved in these appeals has ceased to be of continuing significance in the calculation of the company's fuel charge.

### THE COMPANY'S APPEAL.

The company argues that the department was in error in concluding that its fuel expense adjustment clause produced a fuel charge which did not conform to the requirements of G. L. c. 164, § 94G. It argues that its fuel expense adjustment clause was proper because it permitted the company to collect revenue which in part offset its investment in Millstone #2, a facility whose existence and operation were not reflected in the company's rates. The company concedes that the fuel charges developed pursuant to its fuel expense adjustment clause produced revenues in excess of its cost of fuel. The department, after a period of intermediate ambivalence, ultimately decided that a fuel charge could not be used for such a purpose. In its decision of July 13, 1976, the department stated that the recovery of capacity costs associated with Millstone #2 by use of a fuel expense adjustment clause was "an extraordinary procedure." It said that "[c]ustomarily costs of this nature are recovered through base rates approved in a rate case." We think that § 94G of G. L. c. 164, does not permit a fuel charge to be used to recover costs which are not related in any way to the cost of fuel.

Section 94G of G. L. c. 164, which is set forth in part in the margin,[11] deals exclusively with fuel charges imposed

---

[11] The first three paragraphs of § 94G, inserted by St. 1974, c. 625, § 1, read as follows: "The department may approve an itemized fuel charge in rates filed by electric companies to reflect adjustments in the cost of fuels and power purchased by such companies.

"The cost of any and all fossil fuel used in generating or supplying electricity to a customer shall be included in said itemized fuel charge and shall be billed at a single uniform rate per kilowatt-hour used by a customer. Such fuel charge shall be the fuel rate multiplied by the number of kilowatt-hours used by a customer. The fuel rate shall be uniform for all customers of any electric company, and said rate shall be calculated by dividing the total cost of fuel used in generating or supplying electricity which is applicable to a billing period by the total number of kilowatt-hours used by all customers. The department shall authorize only such rates as reflect the inclusion of all fuel costs in the fuel charge herein described.

"The department shall establish regulations for the uniform calcula-

by electric companies. A fuel charge must "be billed at a single uniform rate per kilowatt-hour used by a customer" and must be itemized separately on the bill. See G. L. c. 164, § 119A, as amended through St. 1974, c. 625, § 2. See also *Trustees of Clark Univ.* v. *Department of Pub. Utils.*, 372 Mass. 331, 336-337 & n.4 (1977). The fuel charge is "the fuel rate multiplied by the number of kilowatt-hours used by a customer." The "fuel rate" must "be calculated by dividing the total cost of fuel used in generating or supplying electricity which is applicable to a billing period by the total number of kilowatt-hours used by all customers." A fuel rate must "reflect the inclusion of all fuel costs in the fuel charge." St. 1974, c. 625, § 1.

Putting aside, as unnecessary to our decision, the question whether an electric company may restrict its fuel charge to the cost and use of only fossil fuel (or, as the company did in this case, whether only a portion of its cost and use of nuclear fuel may be included in its calculations), we believe § 94G is clear in prohibiting an electric company from employing a fuel charge to collect expenses

---

tion and billing of fuel charges by all electric companies, including provisions for the calculation of such charges by companies which purchase the major portion of their energy requirements from other electric companies. Whenever the department shall determine that it is in the public interest to incorporate in such uniform calculations the use of any factors in addition to the cost of the total amount of fuel consumed and the total kilowatt-hour usage, it shall do so only after public hearing and by a formal written opinion from the department; provided, however, that the department shall review not less than annually the method of calculating all such fuel charges. If an electric company bills customers bimonthly, the fuel charge shall be calculated by multiplying the average of the fuel charge rates applicable to the two months in the billing period by the total kilowatt-hours used in said billing period."

A fourth paragraph of § 94G requires electric companies to file monthly reports and the department to examine those reports and to order any rebates to customers "if the total fuel charges billed to customers exceeds [*sic*] the amount required by companies to pay increases in the cost of fuel and purchased power." The fifth paragraph of § 94G requires a public hearing and department approval before a fuel charge may be billed to customers. See *Consumers Organization for Fair Energy Equality, Inc.* v. *Department of Pub. Utils.*, 368 Mass. 599, 612-613 (1975).

unrelated to the cost of fuel.[12] Section 94G permits only fuel costs to be included in the calculation of a fuel charge and requires that those costs be allocated among all customers based on their energy usage. The company's calculation of its fuel charges both (a) omitted from consideration kilowatt hours attributable to Millstone #2 and (b) in effect treated as fuel costs nonfuel expenses related to Millstone #2, in each instance in clear violation of the mandate of § 94G. The company's departure from the requirements of § 94G produced a fuel factor which failed to reflect solely the cost of fuel. If the company had wished to obtain rate relief because its operation of and investment in Millstone #2 were not reflected in its rates, it should have done so directly and not by imposing a fuel charge which was in excess of its needs to cover the cost of fuel.

The company argues that it is inequitable for the department to change its position concerning the company's fuel expense adjustment clause after approving it on numerous occasions since August, 1974. The company claims that it has relied on the department's determinations and that the department should be estopped from changing its

---

[12] The Attorney General has argued that § 94G requires all fuel costs and energy consumption to be reflected in the calculation of an electric company's fuel charge. We do not read the department's decision of July 13, 1976, as clearly adopting this interpretation of § 94G, but the department's briefs in this court do. The Attorney General's argument has much force based on broad language in the second paragraph of § 94G. However, his argument would have us wholly disregard the word "fossil" in the first sentence of that paragraph, contrary to usual practice in statutory interpretation. See *National Shawmut Bank* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 361 Mass. 219, 222-223 (1972). As originally proposed, the language of the first sentence required "[t]he cost of any and all fuel" to be included in any itemized fuel charge. 1974 Senate Bill No. 1642. However, the word "fossil" was inserted in the quoted clause by 1974 House Bill No. 6229, so that the proposed language read as § 94G now reads: — "any and all fossil fuel." Certainly the intended scope of the second paragraph of § 94G is uncertain on its face. In such a case, the addition of the word "fossil" in the course of the legislative process may be considered in undertaking to determine the Legislature's intention. Of course, what the department may require be reflected in a fuel charge, pursuant to uniform regulations or otherwise, may differ from what § 94G may minimally mandate.

position. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 104 (1975). Without deciding whether principles of estoppel appropriately might apply to an administrative agency in a given situation, we think it clear that the company had no valid basis to rely on the department's earlier action. From August, 1974, until January, 1976, the exclusionary language of the company's fuel expense adjustment clause had no practical significance because Millstone #2 was not in commercial operation. From the first occasion when the exclusionary language became significant (the March, 1976, fuel charge based on the January, 1976, experience), the department expressed uncertainty about the propriety of the company's fuel expense adjustment factor and granted only tentative approval of the company's fuel factors. In addition, the department did not impose a view contrary to that of the company until its order approving the fuel factor to be effective in July, 1976. In such a situation, the company had no reasonable basis after July 1, 1976, to rely on the department's earlier action, and the department was not barred from adopting a position which was the proper one as matter of law. *Automobile Club* v. *Commissioner*, 353 U.S. 180, 183 (1957). *Chisholm* v. *FCC*, 538 F.2d 349, 364 (D.C. Cir.), cert. denied, 429 U.S. 890 (1976). The issue here does not involve an unexplained, apparently whimsical vacillation from one position to another on a subject normally within the department's discretion. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 104 (1975). The question in dispute was one of law.

The company's claim that the department's decision was unsupported by an adequate statement of reasons (G. L. c. 30A, § 11 [8]) and that its decision is not supported by substantial evidence (G. L. c. 30A, § 14 [7] [*e*]) are without merit. As we have said, the question for decision was a question of law, that is, what was permitted and required by § 94G. The essential facts from which the question of law arose were undisputed, and the department's decision amply demonstrates the reason why it disapproved of the company's fuel expense adjustment clause.

## THE ATTORNEY GENERAL'S APPEAL.

We turn then to the appeal of the Attorney General from the decisions of the department concerning the company's fuel charges for use during March and April, 1976. From what we have said already, it is clear that those fuel charges were not calculated in accordance with the requirements of G. L. c. 164, § 94G. In our view, that fact is not dispositive of the question whether the department's earlier decisions must be reversed, fuel charges recalculated, and refunds made. Although it had reserved the right to do so, the department did not order any retroactive adjustment of the company's fuel charges when it finally decided in July, 1976, that the company's fuel expense adjustment clause was contrary to law. Before us, the department argues that its decision represented a major change in its position and that, in its discretion, it could act as it did "to protect the interests of the parties." Echoing, but only in part, a previously discussed argument advanced by the company, the department says that the company was entitled, as we said in *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 84 (1976), to a "warning sufficient to enable the Company to adjust both its practices and its proof to the new situation." We think that the department was entitled, in its discretion, not to compel a retroactive adjustment in the company's fuel factors. The Attorney General has not shown that the company received revenues to which it was not entitled. All that has been shown is that the revenues attributable to Millstone #2 should not have been collected in the form of a fuel charge. A decision of an administrative agency based on an error of law is an adequate ground for setting that decision aside only where "the substantial rights of any party may have been prejudiced" by the agency's action. See G. L. c. 30A, § 14 (7). Here the record fails to show any prejudice to the company's customers. See *Duato* v. *Commissioner of Pub. Welfare,* 359 Mass. 635, 637-638, 640 (1971).

Because of our conclusion that the Attorney General's appeal must fail on the merits, it is not important that we

Western Massachusetts Electric Co. *v.* Department of Public Utilities.

pass on the company's claim that the appeal should be dismissed as to the department's decision of March 1, 1976, because that appeal was not filed seasonably under the terms of G. L. c. 25, § 5.[13] As we observed earlier (see text accompanying note 7 *supra*), the department's decision of March 1, 1976, was a tentative one. That decision did not have an element of finality until at least the department's decision of March 31, 1976, from which (with an authorized extension) the Attorney General filed a timely appeal. Indeed, the latter decision was itself tentative because it called for further consideration of the question of the legality of the company's fuel expense adjustment clause.[14] The final decision on the matter was the department's decision of July 13, 1976, because only then did the department conclude the proceedings on the issue in dispute.

## CONCLUSION.

In summary, the department's decisions and orders are to be affirmed in the proceedings in which the company has appealed (DPU 18129-S [Supplemental] and DPU 18129-V) and in the proceedings in which the Attorney General has appealed (DPU 18129-R and DPU 18129-S). The company's motion to dismiss the appeal from DPU 18129-R should be denied. Any appropriate adjustment in the company's fuel factors for July, 1976, and subsequent months, during which fuel charges were collected in excess of those permitted under G. L. c. 164, § 94G, and any resulting rebates to customers should be made under the supervision of the department. If the department stayed the effectiveness of the company's general rate filing of May 11, 1976 (see G. L. c. 164, § 94G), as we infer it did,[15] and

[13] The single justice reserved and reported the question of proper disposition of a motion to dismiss on this ground.

[14] The company has not argued that the department's decision of March 31, 1976, lacked the degree of finality necessary to permit the Attorney General to appeal under G. L. c. 25, § 5.

[15] If the effectiveness of the company's rate filing of May 11, 1976, was not suspended, the reflection of the consequences of the commercial operation of Millstone #2 in the company's general rates would have required the inclusion of the experience of Millstone #2 in the calculation of the company's July, 1976, fuel factor.

the rates ultimately approved were higher than those in effect on May 11, 1976, the department may conclude that all or some portion of any refunds to customers which are indicated as a result of this decision should not be made.

*So ordered.*